[No. 32186. Department Two. June 8, 1953.]

GAASLAND COMPANY, INC., *Appellant,* v. HYAK LUMBER & MILLWORK, INC., *Respondent.*[1]

*Brown & Millhouse,* for appellant.

*O'Leary, Meyer & O'Leary,* for respondent.

[1]Reported in 257 P. (2d) 784.

FINLEY, J.—Plaintiff, Gaasland Company, Inc., in its complaint, claimed damages for breach of an alleged contract to furnish lumber millwork products. At the conclusion of plaintiff's case, the defendant, Hyak Lumber & Millwork, Inc., moved for a nonsuit. The motion was based upon two grounds: (a) That plaintiff's evidence did not prove the existence of a contract between the parties, and (b) that no damages were established by the evidence. The trial court granted the motion on the first ground and dismissed the case. Gaasland Company, Inc., has appealed.

In effect, defendant's motion constituted a demurrer to plaintiff's evidence. In our review of the action of the trial court, we are governed by the principle that, at the nonsuit stage, the plaintiff's evidence and reasonable inferences therefrom must be construed in the light most favorable to the plaintiff. Construing plaintiff's evidence in this manner, our inquiry then is whether it provided a basis on which the jury, reasonably, rationally, and logically, might have found for the plaintiff: that is, that the parties had entered into a contract.

We shall outline briefly the significant background facts relative to this case. Gaasland Company, Inc., held prime contracts for construction work on military installations at Cape Lisbourne, Romanzof, and Wales, Alaska. Gaasland solicited bids regarding the furnishing of lumber millwork for the three projects. Tacoma Sash & Door Company submitted the lowest bid; Hyak Lumber & Millwork Company, Inc., was the next lowest bidder. Thereafter, it developed that the millwork would have to be delivered to Seattle docks at an earlier date than originally anticipated in order to permit its transportation to Alaska before shipping would be suspended because of inclement weather; otherwise, important military construction would be delayed for several months. With the military authorities urging haste, Roy Gaasland (head of the company) and Sam Baker (its Alaska manager) held a conference in Seattle with V. L. Johnson (manager of Hyak) and Ken Leevers (manager of Tacoma Sash & Door Company) to discuss expediting acquisition of the millwork.

It is contended in behalf of the Gaasland Company that its evidence established a *prima facie* case that a contract was entered into with Hyak at this conference, whereby Hyak agreed to furnish the millwork for the Lisbourne job and one half of that required for the Romanzof job, and that, thereafter, Hyak refused to perform and Gaasland was forced to obtain all of the millwork through Tacoma Sash & Door, which resulted in increased costs and consequent damages to Gaasland Company in the sum of $14,071.99. Obviously, Hyak's contention is to the contrary—that the evidence at the conclusion of plaintiff's case clearly shows that no contract was entered into, and that the only understanding reached was a conditional one, or an agreement to contract in the future, dependent entirely upon the ability of Hyak to obtain scarce items of lumber necessary for the manufacture of the millwork. As pointed out above, the trial court agreed with Hyak and granted a motion for a nonsuit.

Viewing Gaasland's evidence and the reasonable inferences therefrom in the most favorable light, it seems to us the following *prima facie* facts emerge: Hyak had submitted a bid for the millwork on all three jobs and was in possession of information as to the specifications to be met in manufacturing all of the millwork. Hyak and Tacoma were invited to confer with Gaasland in Seattle regarding expediting acquisition of the millwork for earlier shipment to Alaska than specified in the call for bids. Messrs. Johnson and Leevers traveled to Seattle together by automobile and conferred with officials of the Gaasland Company. There, acceleration of the delivery date was discussed. Neither Hyak nor Tacoma, individually, had the facilities to produce all of the millwork in time to meet the earlier shipping date. After a brief discussion, Johnson and Leevers left Gaasland's representatives for the specific purpose of conferring together as to a possible division of the millwork between their two firms. Their discussion lasted from one-half hour to an hour. They conferred again with Baker. During the discussion with Leevers, or the immediately following one with Baker, a memorandum was prepared by Johnson in his hand-

writing on one of Hyak's printed forms, which read as follows:

"Hyak Lumber and Millwork, Inc.
"Olympia, Was.
"Req. to Hyak Lbr. and Millwork, Inc.
"Olympia, Wash.

| "Lisburne Proj. ......................... | 26,525.75 | plus 7% |
| | 1,856.80 | |

"As-per-Tacoma [crossed out]    28,382.55
"As Per Letter of Quotation—
"With Exceptions.

| "½ Romanzof ......................... | 26,583.41) |
| "Plus ............................... | 900.00) |
| | 27,483.41) |
| "Plus 7% ........................... | 1,923.84) |
| | 29,407.25 ......$14,703.62 |

"Romanzof job to be split with
"Tacoma Sash & Door as per
"Buildings agreed upon.
"Req. to Tacoma Sash & Door Co.

| "Wales Proj. ......................... | 26,319.09 |
| "7% ................................. | 1,842.33 |
| | 28,161.42 |

"½ Romanzof .........................$14,703.62"

Johnson gave the memo to Roy Gaasland or to Sam Baker, and talked briefly with the two men. As to this, Gaasland's testimony was as follows:

"A. I was introduced to them, shook hands with them, discussed the urgency, necessity of delivery, of obtaining this millwork as rapidly as possible. They retired at this time with Mr. Baker to, I believe, to a room in the same hotel, either next door, or maybe one floor down. Q. And then they retired from your presence. Did they come back later? A. Yes. They came back and I believe it was Mr. Johnson passed me this piece of paper and said — Q. Showing you Plaintiff's Exhibit No. 2, is that the piece of paper, the one you speak of? A. That is correct. Q. And what was said about it then? A. This was the best deal that they could give us and give us delivery. I stressed again the necessity of hurrying up, shipping it as fast as it was being manufactured and shipping it down to — I forget — Pier 50 or 51 in Seattle and told them to get a moving, snap into it; didn't

want any alibis. That is all there was. Q. They handed you this? A. That is right. Q. And did you express an acceptance of this? A. Yes, certainly; told them to go to it. Q. And was there anything else said on their part about it? A. Not to me. Q. They went on out and away then? A. That was the completion as far as I was concerned."

Johnson, called as an adverse witness, stated that the memorandum, in his handwriting, indicated a way by which the millwork on the three jobs could be split for handling, partly by Hyak and partly by Tacoma.

Baker testified as follows:

"A. Then Mr. Leevers and Mr. Johnson, after getting our picture, retired. I don't know if they went to another room, or in the lobby. They said they would like to get together and come back and tell me what they would do on it. I can't remember how long they were gone, half an hour, or hour, something like that and they came back and then the three of us went into an anteroom there, in where we had our offices set up and they came up with the proposition that they would build the millwork on the three jobs, using a basic figure and adding ten percent for added overtime, which would be necessary in their plant to get the work done and after a little haggling around, I got them down to seven percent; didn't want to take their first offer. Mr. Millhouse: Q. This was all conversation to you now? A. Yes, and on the Romanzof job there was some eighteen hundred dollars between the two bids, so we split it right down the middle and added nine hundred to the low bid plus the seven percent for overtime. In the meanwhile Mr. Johnson took out this pad of paper and wrote the whole deal up that we agreed on in that room and handed it to me, which was to be the basis of our purchase order to be sent to him. I went into the room where Miss Stock and Mr. Porter were typing myriads of purchase orders and got a purchase order number which I gave to Mr. Johnson and Mr. Leevers and told them the purchase order would be forthcoming. The deal was made and that was all there was. I went back to the room and told Mr. Gaasland and Mr. Bellingar and Mr. Leevers and Mr. Johnson left."

A Mr. Bellingar testified:

"A. It seemed to be the consensus of the meeting there was a lot of work to be done and that the job should be divided and with that thought in mind, Mr. Johnson and Mr. Leevers left the room. Mr. Baker and I stayed in that par-

ticular room doing some other business. I believe Mr. Gaasland was gone for a short time, but was back. When they returned, Mr. Johnson handed Mr. Baker some written setup on what they proposed to do in the division of the work. I didn't read that, except that I recognized it was a, looked to me, at least, like some kind of billing form. The discussion was reduced from a, from ten to seven percent. At the finish of the discussion Mr. Gaasland made some statement to them to the effect to go ahead and do it, it just had to be there on August the fifteenth and they indicated they were going to do it and they all shook hands and left the room. I am speaking now of Mr. Leevers and Mr. Johnson."

Lastly, the evidence shows that Tacoma immediately went to work making the part of the millwork which it considered it was obligated to deliver as a result of the agreement reached at the conference. Certain kinds of lumber essential for manufacturing the millwork were in short supply at the time. Tacoma notified Hyak that a carload of such lumber would be turned over to Hyak to assist the latter in making its part of the millwork.

■ We are convinced that the evidence, outlined above, provides a basis on which reasonable minds might differ on the question of whether the parties had entered into a contract, and that the trial court erred in reaching a contrary conclusion. By this, we do not mean to say that Hyak cannot possibly counter Gaasland's evidence. In fact, much of the testimony of Johnson (called as an adverse witness by Gaasland) is in conflict with testimony of Gaasland's other witnesses. What we mean to say is that the evidence, as we construe it, was sufficient to establish a *prima facie* case of contract.

In *Washington Shoe Mfg. Co. v. Duke,* 126 Wash. 510, 218 Pac. 232, 37 A. L. R. 611, we said:

*"The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from their outward expressions and acts, and not from an unexpressed intention.* In 13 C. J. 265, it is said:

" 'The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. It judges of his intention by his outward

expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject.'" (Italics ours.)

Next, we consider Hyak's contention that, even if a contract be proved, the plaintiff still cannot recover because his evidence is not adequate to remove the matter of damages from the realm of speculation and conjecture and, hence, does not meet the general requirement of the law of damages—that damages must be shown to be ascertainable with reasonable certainty.

In this connection, Gaasland contends that it has made out a *prima facie* case of damages; in other words, that damages can be determined, with reasonable certainty, by considering the difference between the contract price for the jobs respondent was to do and the price ultimately charged by Tacoma, and letting the jury determine whether the prices ultimately paid were reasonable. Pertaining to the foregoing, Gaasland urges that, once it shows this difference between the contract price and the price ultimately paid, it has made out a *prima facie* case, and that any matters which show the prices actually paid were unreasonable, and, hence, in violation of plaintiff's duty to mitigate damages, are matters of affirmative defense for the defendant to plead and prove. Apparently, Hyak does not dispute the latter point.

We cannot agree with Hyak that there is no evidence from which the jury could properly assess damages, that the matter of damages to be deduced from the evidence is hypothetical, conjectural, and speculative.

The classic statement of the rule of certainty, which is reiterated in the cases, often without analysis, is that damages, to be recoverable, ". . . must be certain, both in their nature and in respect to the cause from which they proceed." (*Griffin v. Colver*, 16 N. Y. 489, 495, 69 Am. Dec. 718 (1858).) Generally, also, ". . . the 'certainty' requirement is usually accompanied by the statement that

the damages must not be 'contingent,' 'conjectural,' or 'remote.' Seemingly these phrases have but little additional content." (McCormick on Damages 99, § 25) See, also, 15 Am. Jur. "Damages" 410, § 20; 5 Williston on Contracts 3776, § 1345.

If the rule of certainty were literally applied to contract damages, perhaps recovery would be barred in most instances since, in such cases, it is extremely difficult, if not virtually impossible, to determine damages with precise mathematical exactitude. Hence, the rule has come to mean that only *reasonable* certainty as to the fact and amount of damages is necessary:

"§ 331. Degree of Certainty Required in Establishing the Amount of Profits and Losses; Alternative Methods.

"(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." 1 Restatement of Contracts 515, § 331.

"§ 26. The certainty rule, in its most important aspect, is a standard requiring a reasonable degree of persuasiveness in the proof of the fact and of the amount of the damage. Through its use, the trial judge is enabled to insist that the jury must have factual data—something more than guesswork—to guide them in fixing the award." McCormick on Damages 99, § 26.

See, also, 15 Am. Jur. "Damages" 410 *et seq.*, § 20; 5 Williston on Contracts 3776, § 1345.

■ Furthermore, the doctrine respecting the matter of certainty, properly applied, is concerned more with the *fact of damage than with the extent or amount of damage.* In the main, the doctrine usually applies to bar recovery for loss of profits in a business which has not been established. We recognized this very distinction in the recent case of *Dunseath v. Hallauer*, 41 Wn. (2d) 895, 253 P. (2d) 408, where we stated that the uncertainty involved went to the *amount* of damages and not the *fact* of damage. See, also, 1 Restatement of Contracts 515, § 331, Comments b. to d.; McCormick on Damages 104-106, § 28; 5 Williston on Contracts 3776-3778 *et seq.*, § 1345.

A number of qualifications have been developed to modify the harsh effects of a rigorous application of the rule of certainty. See McCormick on Damages 101, § 27.

The most important qualification, and one relevant to the case at bar, is the difference in the quantum of proof needed to establish the fact of damage as against that needed to establish the amount of damage:

"There is a clear distinction between the measure of proof necessary to establish the fact that the plaintiff has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. Formerly, the tendency was to restrict the recovery to such matters as were susceptible of having attached to them an exact pecuniary value, but it is now generally held that the uncertainty which prevents a recovery is *uncertainty as to the fact of the damage and not as to its amount and that where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.* . . .

"The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise and by reference to some definite standard, *such as market value, established experience, or direct inference from* known circumstances." (Italics ours.) 15 Am. Jur. "Damages" 414, § 23.

In this connection, see, also, 5 Williston on Contracts 3778 *et seq.*, § 1346.

Since the basic function of the rule of certainty is to assure that one will not recover where it is highly doubtful that he has been damaged in the first instance (as where he claims loss of profits in a business which is not shown to have any established record of earnings), the jury does not commit forbidden speculation when, once the fact of damage is established, it is permitted to make reasonable inferences based upon reasonably convincing evidence indicating the amount of damage. Applying this rule to the case at bar (assuming that a jury could find that a contract had been entered into by the parties), clearly, the fact of substantial damage is shown by proof of Hyak's breach and Gaasland's resulting increased costs. Once such a *prima facie* showing is made, there is sufficient evidence in the

record to permit reasonable inferences to be drawn therefrom as to the extent of damage.

We are impressed with the statement on this aspect of the rule as found in Comment a., § 331, of 1 Restatement of Contracts 515:

"*Comment: a.* The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his harm; nor does it mean that he cannot get damages unless he proves the exact amount of his harm. The requirement merely excludes those elements of harm that cannot be evaluated with a reasonable degree of certainty. There is usually little difficulty in proving the amount of actual expenditures . . . [as here]. Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court."

For a further discussion of the general rule, see 5 Williston on Contracts, *supra,* §§ 1345-6; 15 Am. Jur. "Damages" 412, § 21.

Clearly, there will be difficulties in assessing the damages in the case at bar; but, as shown by the authorities just quoted, that is not sufficient reason for denying plaintiff recovery. In *Dunseath v. Hallauer, supra,* we recognized that difficult in computing damages was no ground for denying relief.

For the reasons indicated herein, the judgment of dismissal of the trial court is reversed, and the case is remanded for a new trial.

SCHWELLENBACH, HILL, HAMLEY, and OLSON, JJ., concur.

---

July 16, 1953.  Petition for rehearing denied.