[No. 2555–3.   Division Three.   December 5, 1978.]

JOYCE MARIE HUTSON, *Appellant,* v. WENATCHEE
FEDERAL SAVINGS AND LOAN ASSOCIATION,
*Respondent.*

92

*Rodney M. Reinbold,* for appellant.

*Davis, Arneil, Dorsey, Kight & Parlette* and *Robert L. Parlette,* for respondent.

ROE, J.—Plaintiff Joyce Hutson and her husband Larry approached defendant Wenatchee Federal Savings and Loan Association originally for a home improvement loan, but decided to construct a new home instead when defendant's employee, Mr. Graff, suggested that that would be easier to finance. Having obtained a house plan, they returned to apply for the loan in September of 1971. The loan transaction proceeded smoothly enough; the money was lent and the house was built.

This lawsuit arose when an unfortunate accident killed Larry Hutson in November of 1972. Plaintiff alleged that Mr. Graff's words and conduct had created an implied contract that defendant would procure "credit life insurance" on Larry Hutson's life, but none was obtained. (Credit life insurance would pay the balance of the mortgage if the mortgagor should die.) The bank procured only "mortgage insurance." (Mortgage insurance, as the term is used in the savings and loan industry, only insures the lender; the insurer will pay the lender and take on the burden of foreclosing on the debt should the borrower default.) The parties' testimony diverges sharply, however, on what was said about credit life insurance. Plaintiff Joyce Hutson[1] claims that she asked for credit life insurance on her husband's life "in case something happened to the breadwinner"; defend-

---

[1]Since the record does not refer to anything Larry Hutson might have said, and since Joyce Hutson apparently conducted all discussions with the defendant, she will be referred to in this opinion as the sole borrower.

ant disputes that she clearly indicated what she wanted. Plaintiff also claims that Mr. Graff never told her what mortgage insurance is, and Mr. Graff asserts that he did. When plaintiff saw she was paying for mortgage insurance, she claims that she believed it was credit life insurance and that defendant never explained that it was anything else.

Plaintiff sought recovery under two separate but interrelated theories. First, as has been stated, she claimed that defendant, through its employee Mr. Graff, had impliedly agreed to procure credit life insurance for her protection. Thus, she claimed that defendant's failure to procure credit life insurance was a breach of the implied contract, for which she is entitled to recover damages. The trial court refused to submit this theory of recovery to the jury. Second, plaintiff claimed that defendant had a duty to define for her the term "mortgage insurance." She alleged that defendant did not define it, and that such failure constituted negligence. The trial court instructed the jury on negligent misrepresentation, but also instructed that defendant had no duty to define the term. This appeal followed the jury's verdict that defendant was not negligent. Plaintiff raises numerous assignments of error which we discuss under these two theories of recovery.

## IMPLIED CONTRACT THEORY

Plaintiff's first alleged ground of error is that the trial court refused to instruct the jury on her theory of implied contract. In effect, the court's refusal operated as a ruling that plaintiff had not presented enough evidence to withstand a motion to dismiss this claim for insufficient evidence. In such a case,

> the plaintiff's evidence and reasonable inferences therefrom must be construed in the light most favorable to the plaintiff. Construing plaintiff's evidence in this manner, our inquiry then is whether it provided a basis on which the jury, reasonably, rationally, and logically, might have found for the plaintiff: that is, that the parties had entered into a contract.

*Gaasland Co. v. Hyak Lumber & Millwork, Inc.,* 42 Wn.2d 705, 706, 257 P.2d 784 (1953). In short, the question is whether plaintiff made a prima facie case of implied contract.

Plaintiff testified that when she applied for the loan at defendant's office she spoke with Mr. Graff,

> and at that time we asked for insurance *in case something happened to the breadwinner,* and in turn Mr. Graff said that they had available life insurance and disability insurance and he did some figuring and then he told me that with the HOAP[2] program we had to be within a percentage basis in order to qualify.

(Italics ours.) She stated that Mr. Graff, after consulting his rate books, told her that life and disability premiums together would take her above the maximum debt limits for the loan.

> At this time we told him we were not interested in disability insurance at all, that we wanted the life insurance. And so then he proceeded to take out his books again, evidently to look up the premium, the monthly premium, and after some time of figuring he said that he had it, he said ["]I have got it,["] so we assumed then, that he had figured in the life insurance along with our other installments and what have you.

Plaintiff also points to the loan application form (Exhibit 1), prepared by defendant, which stated that $39.22 (a handwritten figure) per month is to be paid "for taxes, fire insurance, assessments, *and life insurance* . . ." (Italics ours.) Plaintiff claims that she relied upon the above exchange with Mr. Graff and upon the language in the loan application, and that she reasonably believed that Mr. Graff, as defendant's agent, had agreed to procure credit life insurance on her husband's life for this debt. Plaintiff also alleged, and defendant did not dispute, that she and her husband had obtained credit life insurance on every other installment debt they had, including their account at

---

[2]The Housing Opportunity Allowance Program, a federally sponsored subsidy for qualifying home purchasers.

Montgomery Ward's. She also stated that when she received various forms and notices from the defendant which showed that she was paying a $210 per year premium for "mortgage insurance," she believed this in fact referred to credit life insurance. She claimed that Mr. Graff never explained to her what mortgage insurance is and that it is not life insurance.

■ We believe that this evidence was sufficient, as a matter of law, to establish a prima facie case of implied contract sufficient to take the case to the jury.

Acceptance of an offer may be implied from conduct as well as from words.

*DeBritz v. Sylvia,* 21 Wn.2d 317, 321, 150 P.2d 978 (1944). Justice Holmes' classic statement is relevant here:

To lead a person reasonably to suppose that you assent to an oral arrangement is to assent to it, wholly irrespective of fraud.

*O'Donnell v. Clinton,* 145 Mass. 461, 463, 14 N.E. 747, 751 (1888). This is not to say that defendant cannot possibly counter or overcome plaintiff's claims with proof of its own. In fact, defendant sharply disputed certain elements of plaintiff's testimony. What we hold is that a legitimate issue was presented for resolution by the trier of fact. *See Gaasland Co. v. Hyak Lumber & Millwork, Inc., supra.*

Plaintiff further alleges that it was error for the trial court to give its instructions Nos. 14, 15, 16, 17, and 18. These instructions as a group restate some of Washington's statutory law respecting life insurance: that a written application is required;[3] that, to act as an insurer, one needs a certificate of authority from the insurance com-

---

[3]Instruction No. 14:

"You are instructed that it is the statutory law of the State of Washington that:

"'No life or disability insurance contract upon an individual . . . shall be made or effectuated unless at the time of the making of the contract the individual insured, being of competent legal capacity to contract, in writing applies therefor or consents thereto . . .'"

missioner;[4] that certain formalities are required;[5] that the policy must be delivered to the insured;[6] and that a writing is required, so that an oral binder cannot require an insurer to issue a life insurance policy.[7]

---

[4]Instruction No. 15:

"You are instructed that it is the statutory law of the State of Washington that:

    "'(1) No person shall act as an insurer and no insured shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the commissioner and then in force; except, as to such transactions as are expressly otherwise provided for in this code.

    "(2) Every certificate of authority shall specify the name of the insurer, the location of its principal office, the name and location of the principal office of its attorney in fact if a reciprocal insurer, and the kind or kinds of insurance it is authorized to transact in this state.

    "(3) The investigation and adjustment of any claim in this state arising under an insurance contract issued by an unauthorized insurer, shall not be deemed to constitute the transacting of insurance in this state.'"

[5]Instruction No. 16:

"You are instructed that it is the statutory law of the State of Washington that a contract of life insurance must be in writing and that:

    "'(1) The written instrument, in which a contract of insurance is set forth, is the policy.

    "(2) A policy shall specify:

        "(a) The names of the parties to the contract. The insurer's name shall be clearly shown in the policy.

        "(b) The subject of the insurance.

        "(c) The risk insured against.

        "(d) The time at which the insurance thereunder takes effect and the period during which the insurance is to continue.

        "(e) A statement of the premium, and if other than life, disability, or title insurance, the premium rate where applicable.

        "(f) The conditions pertaining to the insurance.

    "(3) If under the contract the exact amount of premiums is determinable only at termination of the contract, a statement of the basis and rates upon which the final premium is to be determined and paid shall be furnished any policy examining bureau having jurisdiction or to the insured upon request.'"

[6]Instruction No. 17:

"You are instructed that it is the statutory law of the State of Washington that:

    "'Subject to the insurer's requirements as to payment of premium, every policy shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance.'"

[7]Instruction No. 18:

Plaintiff never alleged that in fact a life insurance contract had been formed; rather, she alleged that the defendant had impliedly contracted to *procure* credit life insurance for her on this debt. Defendant contends, with some justice, that these instructions, particularly instructions Nos. 14 and 17, are important because they shed light on the reasonableness and justifiability of plaintiff's reliance upon the alleged implied contract. Plaintiff apparently did have experience with both life insurance and credit life insurance on several occasions in the past; thus, her reliance is possibly less justifiable because the same procedures that she had been through with respect to prior insurance had not been followed in this case. Plaintiff responds, however, that the prejudicial impact of these instructions outweighs their power of clarification. We agree. Since plaintiff does not claim that an insurance contract actually was formed, the instructions spelling out the statutory requirements are much more likely to cause the jury to conclude that plaintiff's theory presents a legal impossibility. Such instructions add nothing to clarify the law surrounding plaintiff's actual contention that an *implied* contract to *procure* life insurance had been formed, and failure to give them would in no way deprive defendant of its theory that plaintiff's reliance was unjustifiable. On balance, we believe that these instructions were prejudicial.

Following its set of instructions on life insurance statutory law, the court also instructed the jury[8] that plaintiff must be presumed to know the law. The court did not instruct that the presumption could be rebutted. This instruction essentially told the jury that plaintiff's initial

---

"You are instructed that it is the statutory law of the State of Washington that neither an insurance agent or service representative can bind an insurance company to issue life insurance on an oral binder or are authorized or empowered to procure credit life insurance, whether requested orally or in writing, unless the applicant affirmatively applies therefor in writing."

[8]Instruction No. 19:
"You are instructed that all persons are charged with knowledge of the provisions of statutes and must take notice thereof."

reliance upon defendant to procure credit life insurance for her was unjustifiable because she never filled out an application, and this became even more unjustifiable when the other statutory requirement of delivery remained unfulfilled.

The presumption that people know the law most frequently applies to criminal cases; it is more properly stated that one may not escape criminal liability by claiming ignorance of the law. In the civil area, most cases wherein the presumption is applied concern dealings with a governmental entity such as a municipal corporation, *e.g.*, *State ex rel. Bain v. Clallam County Bd. of County Comm'rs,* 77 Wn.2d 542, 463 P.2d 617 (1970); *State ex rel. Dungan v. Superior Court,* 46 Wn.2d 219, 279 P.2d 918 (1955); *Terrace Heights Sewer Dist. v. Young,* 3 Wn. App. 206, 473 P.2d 414 (1970), the state government, *e.g.*, *State ex rel. Troy v. Yelle,* 36 Wn.2d 192, 217 P.2d 337 (1950); *Trudeau v. Pacific States Box & Basket Co.,* 20 Wn.2d 561, 148 P.2d 453 (1944), or the courts, *e.g.*, *State ex rel. Lyle v. Superior Court,* 3 Wn.2d 702, 102 P.2d 246 (1940); *Dulien Steel, Inc. v. Lampson R.R. Contractors, Inc.,* 12 Wn. App. 232, 529 P.2d 848 (1974); *Grossman v. Will,* 10 Wn. App. 141, 516 P.2d 1063 (1973). The presumption also applies to those who ought to know the law, such as a state banking supervisor, who should be presumed to know banking law, *Hansen v. Agnew,* 195 Wash. 354, 80 P.2d 845 (1938), attorneys, *e.g.*, *Seattle–First Nat'l Bank v. Brott,* 15 Wn.2d 177, 130 P.2d 363 (1942); *In re Estate of Krueger,* 173 Wash. 114, 21 P.2d 1030 (1933), or city officials, *e.g.*, *State ex rel. Bradway v. DeMattos,* 88 Wash. 35, 152 P. 721 (1915). Other matters also implicating the public interest will call for application of this presumption: people are presumed to know what a railroad crossing signal means, *Byerley v. Northern Pac. Ry.,* 11 Wn.2d 604, 120 P.2d 453 (1941); executors of estates, vested with authority by the courts, are presumed to know community property law, *In*

*re Estate of McHugh,* 165 Wash. 123, 4 P.2d 834 (1931); people are presumed to know that delinquent property taxes may result in a tax sale, *Dowgialla v. Knevage,* 48 Wn.2d 326, 294 P.2d 393 (1956).

The presumption may also be applied to resolve ambiguity in written instruments. One example is

> the presumption that a testator must be presumed to have known the law and that he can dispose of only his half of the community property, so that such disposition must relate to his own property only. *Collins v. Collins,* 152 Wash. 499, 278 P. 186 (1929).

*In re Estate of Patton,* 6 Wn. App. 464, 471, 494 P.2d 238 (1972). This presumption is applied as to a dead person whose intent is the issue before the court. The presumption merely aids in discovering the testator's intent, and operates to implement the state's public policy. The presumption may be rebutted by sufficiently clear evidence, *In re Estate of Patton, supra.* In another case, the parties to a complex transaction involving a construction contract assignment and a guaranty thereof were presumed to have known long–settled law respecting creditor priority. In *Van Doren Roofing & Cornice Co. v. Guardian Cas. & Guar. Co.,* 99 Wash. 68, 168 P. 1124 (1917), the court presumed such knowledge when refusing to find parol testimony sufficient to show that the written agreement was not the full agreement between the parties. The law, as presumed to have been known, resolved a particular ambiguity in the document.

Defendant would find no help from *Watson v. Washington Preferred Life Ins. Co.,* .81 Wn.2d 403, 502 P.2d 1016 (1972), which contains language to the effect that corporate shareholders are presumed to be familiar with the statutes governing their rights. The court stated that the shareholders were entitled to assume that their absence from a meeting would act as a negative vote on a proposed merger, since the statute requires approval by two–thirds of

the outstanding shares. But in holding that the "missing shareholder" statute as it then existed, RCW 23A.08.305, did not require constitutionally sufficient notice under due process standards, the court did not presume that the shareholders knew that, under the statute, a court–appointed proxy could vote their shares for them.

■ We believe it would be excessively harsh and contrary to common sense to presume that people always know the law. Further, to operate, as this presumption would, to supply the material fact that plaintiff's reliance was unjustifiable also raises due process concerns. In the criminal context, such use of presumptions has been held to violate the Fourteenth Amendment's due process clause, *Manley v. Georgia,* 279 U.S. 1, 73 L. Ed. 575, 49 S. Ct. 215 (1929); *State v. Roberts,* 88 Wn.2d 337, 562 P.2d 1259 (1977); *Seattle v. Ross,* 54 Wn.2d 655, 344 P.2d 216 (1959). We do not believe this presumption should be used to supply a fact material to the controversy. *See Murphy v. Sheftel,* 121 Cal. App. 533, 9 P.2d 568 (1932); 31 C.J.S. *Evidence* § 132(2), 259–60 (1964). We thus refuse to adopt the approach taken by the federal district court, interpreting Virginia law, in *Burgess v. Charlottesville Sav. & Loan Ass'n,* 349 F. Supp. 133 (W.D. Va. 1972), *rev'd on other grounds,* 477 F.2d 40 (4th Cir. 1973).

## NEGLIGENCE THEORY

Plaintiff's other theory of recovery is that defendant negligently failed to define "mortgage insurance" for her as it is used in the savings and loan industry. Plaintiff contends that defendant should have known that the term "mortgage insurance" is ambiguous and unclear, and hence that defendant ought to explain the term to loan applicants, particularly those expressing an interest in credit life insurance. She alleges that use of the term on several documents confused her and misled her into believing that she had bought credit life insurance when what she had in fact purchased was mortgage insurance. Her belief, then, induced her to refrain from following up her original request for

credit life insurance or from purchasing such insurance independently. *See* Restatement (Second) of Torts § 551, *Liability for Nondisclosure* (1977).[9]

The primary flaw plaintiff finds in the trial court's instructions is its instruction No. 12,[10] which told the jury that the bank's only duty to her was to exercise good faith, and that the defendant had no duty to explain mortgage insurance to her. It does not seem particularly important to distinguish between a cause of action for negligence and a cause of action for negligent misrepresentation; the latter seems to be merely a more specific statement of the type of negligence involved. The questions are: (1) Could the defendant have had a duty to define "mortgage insurance" in the context of the facts in this case? (2) If so, did the defendant adequately perform that duty? (3) If not, did its failure proximately cause damage to the plaintiff? The first question, of course, is what concerns us here; if the defendant does have such a duty, the other two questions are for the trier of fact.

Restatement (Second) of Torts § 551 (1977), states at page 119:

> (2) One party to a business transaction is under a *duty to exercise reasonable care to disclose* to the other before the transaction is consummated.
> (a) matters known to him that the other is entitled to know *because of a fiduciary or other similar relation of trust and confidence between them;* and

---

[9]Restatement (Second) of Torts § 551, *Liability for Nondisclosure* (1977), states at page 119:
"(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

[10]Instruction No. 12:
"Outside the obligation to lend money as contracted for, the only duty of a lending bank to a borrowing customer is to exercise good faith. Under the facts of this case the defendant had no obligation to define the term mortgage insurance to the plaintiff."

(b) matters known to him that he knows to be necessary *to prevent his partial or ambiguous statement* of the facts *from being misleading; . . .*

(Italics ours.) The lender is not a fiduciary in the common sense of the term; it profits from the business transaction. The lender clearly is entitled to its profit, the interest, and the borrower knows this; thus, in one sense, they deal at arm's length. However, in a case such as this where the borrower was eligible for a subsidy under the federal HOAP program, it was the lender who noticed her eligibility, brought it to her attention, provided the application forms, informed her of how she could qualify, reviewed the application to make sure it fell within the requirements, and submitted it for her to the government. This in itself is a complex relationship: the lender does act as the borrower's adviser by bringing this advantageous program to her attention and helping her to apply for it. But the lender also assists the federal government by screening the very application it helped to complete.

Lenders who deal with individual customers like the plaintiff also often give financial advice about how much debt a person with any given income will be able to carry. Lenders also may explain the legal requirements applicable to any particular loan to the borrower. The Federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (1976), 12 C.F.R. § 226.1 *et seq.* (1978), requires that the lender make certain disclosures to the borrower, which requirements shorten the length of the arm between the parties in that they remove certain factors from the bargaining arena, limiting the amount of leeway the lender has in dealing with its customer. In this case, too, the borrower decided to build a new house rather than remodel an old one based on the lender's financial advice. She also claimed to have had a less expensive house plan available should the chosen one have proven too expensive, and said that she relied upon defendant's assurance that she could afford the loan she took.

Specifically in the area of credit life insurance, plaintiff did mention it to defendant, who, of the two parties, then had sole access to a rate book. Plaintiff had a right to rely, and alleges she did rely, on defendant's statement that a premium for life and disability insurance would be more than she could afford within the debt limits of federal regulations. Many savings and loan institutions, and defendant is one of them, routinely provide the service of arranging credit life insurance for their customers. One of defendant's officers, Joseph Evans, was a licensed agent of one insurance company. Defendant yearly sends out notices to its customers that credit life insurance is available. This extra service, while not changing the relationship to one of fiduciary trust, does mean that the customer will rely upon the lender for one more facet of the entire transaction.

■ We believe that this entire pattern for the relationship between an individual borrower and the savings and loan association represents a quasi–fiduciary relationship of trust and confidence. *See Boonstra v. Stevens–Norton, Inc.,* 64 Wn.2d 621, 625, 393 P.2d 287 (1964), in which the court held that there was a duty to disclose information of which a customer was ignorant. This duty arose because the defendant, a company engaged in the procurement and sale of real estate contracts and mortgages, possessed superior business acumen and experience. A customer with less knowledge, experience, and judgment relied upon the company, which knew the customer was so relying.

■ Section 551(2)(b) of the Restatement would also apply to this situation if the jury should decide that mentioning mortgage insurance without defining it is such a "partial or ambiguous statement" that it might mislead a reasonable customer. Defendant's own officers testified that "mortgage insurance" has a specialized meaning within the savings and loan industry which it does not have elsewhere; thus, it would seem that there is a prima facie case that the term was at least ambiguous. The trial court prevented plaintiff from introducing testimony of two commercial *bank* employees to show that the term has a different

meaning in the banking industry. We believe that this was error and that it would be probative to allow plaintiff to show that the term may indeed be misleading. The jury must, of course, decide precisely what sort of statements defendant made, and whether they were misleading.

Defendant relies heavily upon *National Bank v. Equity Investors,* 81 Wn.2d 886, 506 P.2d 20 (1973), for the proposition that the defendant lender owes no more than a duty of good faith to its customer. Defendant's argument assumes that its duty of good faith, upon which the trial court instructed the jury,[11] would not include a duty to define the term. Without discussing this assumption, we believe that defendant's reliance upon *Equity Investors* is misplaced. Even a cursory glance at that complex case shows that all parties involved were sophisticated real estate investors, all of whom were represented by counsel in all stages of the transactions. This alone is sufficient to distinguish the case, even if it stood for the proposition defendant says it does, because here the plaintiff was not represented by counsel during any stage of the loan application, closing, or disbursement process. However, the court stated:

> *Outside the contract,* the major duty which a construction lender owes *to any other party* is the duty of good faith; though a loan may be inefficiently managed and with adverse consequences, *neither inferior lienors nor absolute guarantors have any recourse* against the lender *unless* it is alleged and proved that *the lender acted in bad faith.*

(Italics ours.) *National Bank v. Equity Investors, supra* at 920. The court was discussing the rights of third parties, lienors and guarantors, to *go* against the lender for negligent mismanagement in disbursing the loan fund. The court was not considering the lender's duty to the borrower who contracted for the loan.

---

[11]Instruction No. 12, see footnote 9.

While the lender's duty is not that of a fiduciary, we hold that, under the circumstances of this case, it was a jury question whether the lender had a duty to define any ambiguous or specialized terms which might mislead unknowledgeable and uncounseled customers, members of the lay public who rely on the lender's advice. The relationship between such parties involves more trust and confidence than is true of ordinary arm's length dealing, even though the lender legitimately profits from the transaction.

Plaintiff also claims that the court erred in giving instruction No. 20,[12] which stated the federal requirement of either mortgage insurance or a 1 percent reserve for high percentage home loans such as that involved here. The instruction stated further that the defendant's policy in all cases was to obtain mortgage insurance rather than to create the 1 percent reserve. Coupled with instruction No. 19,[13] this tells the jury that plaintiff must be presumed to have known what mortgage insurance is and when it is required.[14] As we explained in detail above, we believe it is totally unrealistic to presume that everyone should know this, and no reason for charging this plaintiff with such knowledge appears in the record.

The final issue arises from the trial court's having allowed the defendant to argue that it was both factually and legally impossible for the plaintiff to have been able to acquire credit life insurance in this transaction because

---

[12]Instruction No. 20:

"You are instructed that the Federal Home Loan Bank Board regulations, which govern the defendant's operations, require that for any borrower paying less than a 10% down payment, that the defendant either (1) obtain what is referred to in the regulations as 'mortgage insurance' for the benefit of the lender to protect against possible default by the borrower, or (2) carry a reserve equal to 1% of the loan, to protect against default. The defendant had a policy that in all cases of less [than] 10% down payment loans that it would elect to obtain a mortgage insurance policy from a private mortgage insurance company."

[13]See footnote 6.

[14]While instruction No. 19 charged plaintiff with knowledge of *statutory* law, and instruction No. 20 states a matter of *regulatory* law, there seems to have been

doing so would have put her over the federally imposed debt limit. At the same time the plaintiff was forbidden to offer evidence on, or to argue to the jury, the possibility that, by applying her liquid assets to some of her outstanding debts, she could have rearranged her debt structure so as to have been able to purchase credit life insurance and still remain within the applicable debt ceiling. Defendant contends that advising her to do such a thing would have been to perpetrate a fraud upon the federal government; plaintiff contends that the defendant had a duty at least to explain the problem with the life insurance premium so that she could have rearranged her debt structure by herself to get what she wanted.

We do not believe the lender had a duty to explain how plaintiff could have applied her liquid assets to her outstanding debts, but neither do we believe that to do so would have been fraudulent. However, if plaintiff did ask for life insurance sufficiently clearly to inform defendant of what it was she wanted, then defendant was required to explain why it felt that her obtaining such insurance was impossible. For defendant to keep silent at that point would constitute a failure to disclose under section 551 of the Restatement. We hold that the trial court's forbidding plaintiff to argue this point, while allowing defendant to argue its impossibility defense, was prejudicial to the plaintiff under the negligence theory and constitutes reversible error.

The trial court's judgment is reversed and the cause remanded.

GREEN and McINTURFF, JJ., concur.

Reconsideration denied January 9, 1979.

Review denied by Supreme Court April 20, 1979.

---

no other reason for so instructing than that plaintiff was to be charged with having known of the regulations.