

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BAKER BOYER NATIONAL BANK, | ) | |
| | ) | No. 35526-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES PATTERSON FOUST, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — The trial court granted summary judgment in favor of Baker

Boyer National Bank and entered judgment against James Foust Jr. for the more than $1

million owed by his limited liability company—a debt that Mr. Foust had personally

guaranteed. Mr. Foust appeals, contending the court erred in summarily dismissing his

counterclaims alleging fraud in the inducement and negligent misrepresentation, and in

denying reconsideration. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

This case arises out of a failed investment opportunity originally conceived in

2012 by Greenflex Housing, LLC, (Greenflex[1]) during an oil boom in North Dakota's

---

[1] For simplicity, we refer to Greenflex Housing, LLC as "Greenflex." Other
Greenflex entities exist, but we have no occasion to refer to any of them in this opinion.

Bakken oil field. The oil boom created a housing need that a Washington resident, John

Eakin, and several friends concluded could be profitably addressed by delivering

Greenflex modular homes to locations where oil field housing was needed. Mr. Eakin,

who served as Greenflex's chief executive officer at relevant times, offered the following

explanation of its business plan:

> Greenflex Housing LLC is a company we formed to provide portable
> worker housing for construction, oil, gas, pipeline, and virtually anyone
> who has a need for housing in hard to reach areas. Our company basically
> has "unit owners" who purchase Greenflex homes from the Greenflex
> factory in Salem, Oregon. After looking at the information on how we
> build those homes you will understand why we exclusively use the
> Greenflex brand. Super insulated concrete structures that are fire proof,
> waterproof, mold proof, and virtually indestructible are the perfect solution
> for rental worker housing. The fact that they are portable makes for ease of
> placement in hard to a [sic] build areas with limited infrastructure. The
> basic idea is to have several "unit Owners" who pool their homes into
> Greenflex Housing, LLC so we can be a large housing provider across the
> nation.

Clerk's Papers (CP) at 110.

One of the early investors in the venture was Jason Sundseth, whose limited

liability company (LLC) purchased 30 modular homes, or "units," with financing

provided by Baker Boyer Bank. By the spring of 2013, however, Dr. Sundseth wanted to

sell the LLC's units, which had by then been moved to leased sites in recreational vehicle

(RV) parks in North Dakota. James Foust Jr. learned of the opportunity to purchase the

Sundseth LLC's units from Cameron Jones, a friend of Mr. Eakin's. Mr. Jones

introduced Mr. Foust to Dr. Sundseth, Mr. Eakin, and Greenflex's chief financial officer.

2

In September 2013, Mr. Foust, as managing member of his own LLC, JPF Enterprises (JPF), entered into an agreement to buy the 30 units from the Sundseth LLC, contingent on reaching financing terms with the bank. The agreement provided for a $52,150 sales commission to Mr. Jones, to be paid by JPF.[2]

JPF agreed to purchase the 30 units for $1,245,000, approximately $1,000,000 of which would be paid to the bank in order to discharge the bank's liens. Mr. Foust had not done business with the bank before, but began corresponding with one of its loan officers, Chris Sentz, on or before June 4, 2013. In e-mails exchanged on that date, Mr. Foust identified his expectations, which included that he would have a lease agreement with Greenflex. Mr. Sentz responded with an expression of interest outlining a framework for financing that assumed that Mr. Foust's LLC would have a six-year contract with Greenflex.[3] Over the next four months, Mr. Foust, an experienced business owner and operator, investigated and assessed the potential investment. The bank engaged in its underwriting process.

---

[2] Mr. Foust later speculated that Mr. Jones was retained by the bank to offload the Sundseth LLC's investment, but there is no evidence that Mr. Jones had a connection with the bank. The fact that his commission was paid by JPF suggests that he was acting on Mr. Foust's behalf, not the bank's.

[3] Mr. Sentz's communication's stated assumption was "a negotiated '6 year' contract with John Eakin," but it is undisputed that the bank contemplated a contract with Greenflex, presumably to be executed by Eakin as CEO. CP at 107.

On October 17, 2013, Mr. Foust, as the managing member of JPF, executed a

$1,077,600 promissory note in favor of the bank to close its purchase of the 30 units. The

bank required, and Mr. Foust individually signed, a commercial guaranty. Among Mr.

Foust's representations and warranties in the guaranty was his agreement "that, absent a

request for information, Lender shall have no obligation to disclose to Guarantor any

information or documents acquired by Lender in the course of its relationship with

Borrower." CP at 12.

JPF made its last payment on the note a couple of years later, on November 2,

2015. On March 4, 2016, the bank declared JPF in default, accelerated the loan, and

demanded payment. In December 2016, it brought the action below, suing Mr. Foust

individually on his guaranty. In response to the bank's motion for default or summary

judgment, Mr. Foust answered and counterclaimed, alleging fraudulent inducement and

negligent misrepresentation.

When deposed, Mr. Foust was unable to identify any affirmative misrepresentation

made to him by representatives of the bank, but he believed that misrepresentations might

be uncovered through discovery. He also relied for his fraud and negligent

misrepresentation claims on "sin[s] of omission." CP at 203. This was based on his

belief that bank employees knew but failed to tell him about problems Greenflex had in

2013 with Badlands LLC, the rental manager for Greenflex's units in North Dakota.

Badlands also turned out to be the party holding lease rights to the RV sites where the

units were located. Badlands filed a lawsuit against Greenflex on or about July 12, 2013, in which it reportedly obtained a temporary restraining order against Greenflex. The case was compromised and settled, and the claims against Greenflex were dismissed four weeks later, on August 9, 2013.

The trial court granted summary judgment in the bank's favor. In a motion for reconsideration, Mr. Foust for the first time argued that the bank had violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691, and sought to retract his admission in answering the bank's complaint that he entered into the commercial guaranty on behalf of his marital community. The trial court denied the motion. Mr. Foust appeals.

## ANALYSIS

I. THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT DISMISSING MR. FOUST'S CLAIMS

Mr. Foust argues that the trial court erred in granting summary judgment because genuine issues of material fact exist that require trial. We review a trial court's grant of summary judgment de novo. *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 177, 125 P.3d 119 (2005), *overruled on other grounds by Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1139 (2015). Summary judgment is appropriate when the moving party shows there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The nonmoving party "may not rely on speculation, argumentative assertions that unresolved

factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). "[A]fter the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Id.* Like the trial court, we view all demonstrated facts and reasonable inferences in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

A.      The fraudulent inducement counterclaim was properly dismissed

To prevail on a claim of fraud, the plaintiff must prove nine elements by clear, cogent, and convincing evidence.[4] Among them are that the defendant made a material misrepresentation of existing fact. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 462, 457 P.2d 603 (1969). Fraud in the inducement exists when the misrepresentation is of a matter or matters that motivate a defendant to enter into the transaction. *Pedersen v. Bibioff*, 64 Wn. App. 710, 722, 828 P.2d 1113 (1992).

Mr. Foust does not rely for his claim of fraudulent inducement on a material misrepresentation but contends, instead, that the bank failed to disclose material

---

[4] The nine elements are (1) a representation of existing fact, (2) that is material, (3) and false, (4) the speaker knows of its falsity, (5) intent to induce another to act, (6) ignorance of its falsity by the listener, (7) the latter's reliance on the truth of the representation, (8) her right to rely on it, and (9) consequent damage. *Pedersen v. Bibioff*, 64 Wn. App. 710, 723 n.10, 828 P.2d 1113 (1992).

information. "Ordinarily," however, "the duty to disclose a material fact exists only where there is a fiduciary relationship." *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 Wn. App. 456, 463-64, 656 P.2d 1089 (1982). When a duty to disclose exists, the suppression of a material fact is tantamount to an affirmative misrepresentation. *Crisman v. Crisman*, 85 Wn. App. 15, 22, 931 P.2d 163 (1997).

A bank is not generally a fiduciary of its borrowers; instead, they deal at arm's length. *Tokarz*, 33 Wn. App. at 458-59. Mr. Foust concedes that this court's decision in *Tokarz* provides a controlling legal analysis of the special circumstances in which a bank might owe a duty of disclosure to a borrower. Br. of Appellant at 10-11. In *Tokarz*, the plaintiffs contracted with a builder and contractor to construct a home, obtaining financing through Frontier Federal Savings & Loan. *Tokarz*, 33 Wn. App. at 458. Frontier had made earlier loans for homes that the contractor was building. *Id.* A month after the Tokarzs' financing was arranged, Frontier discontinued lending money to the contractor, having learned from a routine credit report that five liens had been filed on homes he was building. *Id.* When the Tokarzs had their own problems with the contractor, ordered him off the property, and then later learned that Frontier had earlier severed its own relationship with the contractor, they sued Frontier, alleging breach of fiduciary duty and fraud for not disclosing the contractor's financial problems. *Id.* at 458.

On appeal, this court recognized that no prior Washington case had addressed the precise issue of whether there was a special relationship between a plaintiff borrower and

a defendant bank giving rise to a duty to disclose another bank customer's difficulties. *Id.* at 461. In the Tokarzs' case, this court found "none of the special circumstances which may impose a fiduciary duty":

> There is no allegation or evidence that Frontier (1) took on any extra services on behalf of Tokarz other than furnishing the money for construction of a home; (2) received any greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control over the construction; or (4) was asked by Tokarz if there were any lien actions pending.

*Id.* at 462.

Mr. Foust argues that two important factual differences distinguish his case from *Tokarz.* He claims that here, (1) the bank "required" him to contract with Greenflex, Br. of Appellant at 11, (2) at the same time the bank was making inquiries about Greenflex's operations as part of the bank's underwriting of JPF's investment in the housing venture. The only case he suggests recognizes these facts as additional bases for finding a duty to disclose is *Hutson v. Wenatchee Federal Savings & Loan Ass'n*, 22 Wn. App. 91, 588 P.2d 1192 (1978). But *Hutson* predates *Tokarz*, and *Tokarz* characterizes *Hutson* as a classic case of a special relationship that arose because a borrower with "less knowledge, experience and judgment" than bank officers relied, with the bank's knowledge, on the bank officers' superior understanding of the type of mortgage or credit insurance that it was procuring on the borrower's behalf. *Tokarz*, 33 Wn. App. at 460-61.

Unlike the borrower in *Hutson*, Mr. Foust is an experienced businessperson. He cannot demonstrate bank awareness that he relied on the bank to disclose information encountered in the underwriting process because his guaranty expressly disclaimed reliance on the bank to disclose such information. His representation and warranty that the bank had no obligation to disclose information it acquired does not contravene public policy, as he contends on appeal. To the contrary, it clarified the expectations of the parties.

In opposing summary judgment, Mr. Foust did not demonstrate any other special circumstance giving rise to a fiduciary duty of disclosure on the part of the bank. He did not demonstrate that the bank provided services to Mr. Foust other than traditional financing with normal underwriting procedures.

Mr. Foust argues that a fiduciary or special relationship arose because the bank gained a greater-than-usual economic benefit when his purchase of the units spared the bank the need to foreclose on its loan to the Sundseth LLC. To begin with, for a greater-than-usual economic benefit to give rise to a fiduciary duty, it must be a benefit that the parties recognize and that they know (or should know) transforms their relationship to one of unusual trust and confidence. This is clear from the Washington case law on which *Tokarz* relied in concluding that a greater-than-usual economic benefit can give rise to fiduciary duties. There is no evidence that Mr. Foust and bank representatives had a common understanding during loan negotiations that the bank was receiving a greater-

9

than-usual economic benefit from the loan to JPF, so there was nothing to transform their relationship into one of unusual trust and confidence.

Mr. Foust provides no admissible evidence that the bank did benefit economically when JPF stepped into the shoes of the Sundseth LLC. The evidence on which Mr. Foust relies for this argument is at best double hearsay: he points to unsworn electronic mail from Mr. Eakin in which Mr. Eakin recounts information about Dr. Sundseth refusing to make payments and being nine days away from delinquency. This is information that Mr. Eakin might have learned from Dr. Sundseth or that he might have learned from someone further removed from the facts. Mr. Foust presents no admissible evidence that the Sundseth LLC would have discontinued making payments and no evidence, admissible or inadmissible, that Dr. Sundseth and his LLC were weaker financially than JPF and Mr. Foust.

Mr. Foust's most vigorous contention is that the bank imposed a "requirement" that JPF enter into a lease and management agreement with Greenflex, thereby allegedly exercising extensive control over JPF's operations. Br. of Appellant at 5. Mr. Foust's evidence shows only that after he sent an e-mail to Mr. Sentz on the early afternoon of June 4, 2013, expressing his "[e]xpectation[ ]" that he would enter into a lease of the purchased units to Greenflex, the bank made Mr. Foust's expected lease a requirement of

the loan.[5] CP at 108-09. It is normal for commercial lenders extending substantial credit to satisfy themselves, sometimes through loan conditions or requirements, that a borrower's business will be operated competently during the loan term. Mr. Foust's own deposition testimony makes clear that this is what the bank's "requirement" was all about. Asked about the discussion with Mr. Sentz about the bank's requirement for a lease of the units to Greenflex, Mr. Foust testified;

> A     He said that—that the GreenFLEX Housing had a great deal of experience in managing these things, and it was a prerequisite to, you know, pursuing business with Baker Boyer Bank, and probably because that was a board of directors—or whoever approved that line of business—stated that was protection, I guess, on, you know, somebody that was inexperienced coming in.
>
> Q     Explain that. Who was inexperienced?
>
> A     I was inexperienced. I had no experience in managing units in an oil field in North Dakota. This company did. And it made sense.
>
> Q     It made sense to align the borrower with GreenFLEX Housing?
>
> A     Yes.
>
> Q     Did you ever tell the bank you didn't want to have to lease the units you were going to buy to GreenFLEX Housing?
>
> A     No. That was—please understand, that wasn't an option that was even open, that that was a requirement by Baker Boyer Bank.

CP at 172-73.

---

[5] The lease agreement between JPF and Greenflex has an effective date of June 1, 2013, which was several days before Mr. Foust's and Mr. Sentz's initial communications.

There is no evidence that the bank insisted that the operating role Greenflex would fill must be filled by Greenflex to the exclusion of any other operator. Mr. Foust presents no evidence that he ever expressed the desire to fill the operational role with someone else qualified to rent units located in North Dakota. Traditional underwriting requirements that are designed only to ensure competent operation of a business but that do not divest management of the borrower of operational control do not give rise to a fiduciary relationship. *See, e.g.*, *In re Am. Consol. Transp. Cos.*, 433 B.R. 242, 254 (Bankr. N.D. Ill. 2010) ("[C]ontrol is not established when a lender insists on standard loan agreement restrictions, closely monitors the borrower's finances, and makes business recommendations, even [in] the context of heated negotiations. . . . Nor is control established when a borrower hires a management or restructuring consultant selected by the lender.").

Finally, Mr. Foust provides no evidence that Greenflex's dispute with Badlands proximately caused the failure of his investment in the 30 units. As set forth above, the Badlands lawsuit was dismissed with prejudice in less than a month. When deposed, Mr. Foust candidly admitted that the demise of JPF's investment came with the end of the oil boom, explaining, "The major factor was that the drilling pretty much ceased to operate because there was no economical way to transport oil from North Dakota to the refineries in the south." CP at 168. This was problematic for his rental units because, as he put it,

"When they stopped drilling, their people go home." CP at 169. Summary judgment dismissal of the fraudulent inducement claim was proper.

B.    The negligent misrepresentation counterclaim was properly dismissed

To prevail on a claim of negligent misrepresentation, a plaintiff must prove by clear, cogent, and convincing evidence that (1) a defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions, (3) the defendant was negligent in obtaining or communicating false information, (4) the plaintiff relied on the false information supplied by the defendant, (5) the plaintiff's reliance on the false information supplied by the defendant was justified, and (6) the false information was the proximate cause of damages to the plaintiff. *Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002).

"Ordinarily, an omission alone cannot constitute negligent misrepresentation, since a plaintiff must justifiably rely on a misrepresentation." *Merriman v. Am. Guar. & Liab. Ins. Co.*, 198 Wn. App. 594, 614, 396 P.3d 351, *review denied*, 413 P.3d 565 (2017). "But if a party has a duty to disclose information, the failure to do so can constitute negligent misrepresentation." *Id.* As is the case with fraud, the duty to disclose arises only in the context of an inherently fiduciary relationship or some type of special relationship of trust and confidence giving rise to quasi-fiduciary duties of

13

disclosure. *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 121 Wn.2d 726, 732, 853 P.2d 913 (1993).

Summary judgment dismissal of Mr. Foust's negligent misrepresentation claim was proper for the same reason his fraudulent inducement claim was properly dismissed.

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. FOUST'S MOTION FOR RECONSIDERATION

Mr. Foust moved the court to reconsider its summary judgment rulings, relying on CR 59(a)(7) and (9).  In addition to renewing his arguments in opposition to the bank's motion for summary judgment, he argued for the first time that the trial court erred by dismissing his counterclaims because the bank had violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691.  He also requested permission to amend his answer to the bank's complaint, in order to deny that in executing the commercial guaranty, he was acting on behalf of his marital community.

The trial court denied the motion "for the reasons set forth in [the bank's] response." CP at 339.  Mr. Foust characterizes those reasons as "(1) there was no 'adverse action' which required Bank to give its reasons to Foust, (2) Foust relied on conspiracy theories and speculation, and (3) Foust provided no basis to retract his admission of acting on behalf of his marital community." Br. of Appellant at 17.  Additional arguments made by the bank in its response were that Mr. Foust failed to

demonstrate a special relationship giving rise to a duty to disclose and that the Equal Credit Opportunity Act and withdrawal of admission issues were new theories of nonliability that he failed to make initially and that relied on new facts.

"By bringing a motion for reconsideration under CR 59, a party may preserve an issue for appeal that is closely related to a position previously asserted and does not depend upon new facts." *River House Dev. Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012). "But while the issue is preserved, the standard of review is less favorable." *Id.* We review a trial court's denial of a motion for reconsideration for abuse of discretion. *Id.* The trial court's discretion includes its prerogative to refuse to consider an argument that is raised for the first time on reconsideration absent a good excuse. *Id.*

The trial court did not abuse its discretion by refusing to reconsider the issues initially raised in Mr. Foust's opposition to the bank's motion for summary judgment, for the reasons set forth in section I.

As to the new issues, the trial court did not abuse its discretion by refusing to consider them because they were not closely related to positions Mr. Foust had previously asserted. They depended on new facts: whether a communication from Mr. Sentz on August 20, 2013, was an "adverse action" within the meaning of the Equal

Credit Opportunity Act,[6] and whether Mr. Foust had acted on behalf of his marital community in executing the commercial guaranty. For that reason alone, the trial court was not obliged to consider the arguments. *Wilcox v. Lexington Eye Inst.*, 130 Wn. App. 234, 241, 122 P.3d 729 (2005).

In addition, the contention that the Equal Credit Opportunity Act was violated is patently without merit. The act prohibits discrimination on the basis of race, color, religion, national origin, sex, marital status, or because a borrower gets public assistance. 15 U.S.C. § 1691(a). To effectuate its purpose, the act includes protections, one being that an applicant against whom adverse action is taken must be provided by the creditor with a statement of reasons for the adverse action. 15 U.S.C. § 1691(d)(2). "'[A]dverse action' means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). The statement of reasons helps identify when the creditor has acted in a discriminatory fashion.

---

[6] In electronic mail to Mr. Foust on August 20, Mr. Sentz had stated, "I am sorry to inform you that your requested financing for units in North Dakota is no longer a viable possibility." CP at 257. In deposition, Mr. Foust surmised that Mr. Sentz sent the e-mail because Mr. Foust had said he was "out of the deal" because Dr. Sundseth was "impossible to deal with." CP at 188. Six days later, on August 26, Mr. Sentz sent an e-mail to Mr. Foust explaining that he was once again able to consider financing for the 30 units.

Consistent with the clear intent of the legislation, the statement of reasons is required when adverse action is taken on the credit application and in this case there was only one application, by JPF, not Mr. Foust. The bank acted favorably, not adversely, on the application. No statement of reasons was needed because there could be no contention that the bank had discriminated in acting on JPF's credit application.

III.   ATTORNEY FEES

The commercial guaranty provides that Mr. Foust must pay upon demand all of the bank's attorney fees and legal expenses incurred in connection with the enforcement of the guaranty. Under RCW 4.84.330,

> In any action on a contract or lease . . . where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.
>
> . . . .
> As used in this section "prevailing party" means the party in whose favor final judgment is rendered.

Both parties request an award of attorney fees under the terms of the commercial guaranty and RCW 4.84.330, should they prevail. The bank is the prevailing party and is awarded its fees and costs on appeal subject to its timely compliance with RAP 18.1(d).

No. 35526-8-III
*Baker Boyer Nat'l Bank v. Foust*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, A.C.J.

18