IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

WILLIE ECHOLS, an individual,

Appellant,

v.

LANCE LEIH YU LEE, a sole proprietor d/b/a Law Offices of Lance L. Lee,

Respondent.

No. 85408-9-I

DIVISION ONE

UNPUBLISHED OPINION

CHUNG, J. — Willie Echols bought a house at a sheriff's auction and soon after, filed for Chapter 7 bankruptcy. His bankruptcy attorney, Lance Leih Yu Lee, did not include the house in Echols's bankruptcy petition. Echols sued Lee for legal malpractice, contending that if Lee had included the property in the bankruptcy filing, Echols would not have incurred damages in the form of lost equity, increased interest, lost rental income, lost development value, and emotional distress. We affirm the trial court's summary judgment dismissal of Echols's damages claims.

FACTS

On November 9, 2018, Willie Echols bought a house (Property) in Seattle, WA, at a King County Sheriff's auction. Echols financed the purchase with a $280,154.36 mortgage from Eastside Funding LLC (Eastside). Echols knew this loan was "short-term." Its term was only seven months, its three percent

origination fee was financed, its interest rate was 12 percent, and a default would double the interest rate to 24 percent. He also obtained a second mortgage from Eastside for $21,558.18 to finance his down payment on the Property. The second mortgage's terms were similar, but its origination fee, also financed, was seven percent.

Echols understood his "credit history was poor" and that "a [b]ankruptcy would fix some of my credit problems and make it easier to qualify for a refinance." Therefore, he engaged attorney Lee, who filed a Chapter 7 bankruptcy petition for Echols on January 31, 2019. Echols told Lee about the Property and its mortgages, but no sheriff's deed had been recorded at this point. Echols understood Lee's advice to be that he should not include the Property in his bankruptcy petition. In March 2019, King County recorded a sheriff's deed conveying the Property to Echols.

Both of Echols's mortgages with Eastside came due on June 7, 2019. Later that month, the bankruptcy court issued Echols an order discharging his bankruptcy petition. The bankruptcy court closed Echols's case after the trustee filed a report of no distribution.[1] In September 2019, Eastside accelerated Echols's first mortgage and demanded payment in full for $294,007.24, which included accrued interest and costs, or it would foreclose.

---

[1] A trustee's report of no distribution, or NDR, means that Echols's bankruptcy estate did not have any assets to pay unsecured creditors. See Arkison v. Ethan Allen, Inc., 160 Wn.2d 535, 537, 160 P.3d 13 (2007).

During the fall of 2019, Echols tried to refinance his Eastside mortgages. Echols testified in his deposition that he worked with a loan officer, and Echols answered "[n]o" when asked if he did anything separately or apart from that to look for a loan. He further testified that he did not remember the names of any lenders who turned him down or any other lenders who agreed to loan him money. A title report dated November 2019 showed that six people or entities had encumbered the Property with 11 liens totaling $57,162.14. Nine of those liens were filed before Echols initially filed for bankruptcy in January.

On December 31, 2019, one potential lender, Alera Management Group LLC (Alera), provided a "conditional loan commitment" for a "refinance-rehab" loan of $440,000 at 12 percent interest for a term of nine months.[2] A boilerplate loan term required a title report indicating no liens. The loan's 14 additional conditions included evidence of investment by Echols into the Property, an inspection by Alera, a completed loan application, Echols's explanation of his bankruptcy, a complete set of plans for renovating the home at the Property, approved building permits, a contractor's license, a budget, and insurance.

Echols testified at his deposition that "Alera said 'No' when we could not get a clear title" because of the liens against the Property. He explained, "When it came back that I did not have a clear title, then everyone backed off and said, 'You got to get a clear title before we can do anything.' " Echols believed these

---

[2] Specifically, the rate was 12 percent on drawn funds or three percent on undrawn funds through the first six months of the loan.

3

liens should have been discharged in his bankruptcy. He approached Lee, who, according to Echols, wanted "an additional $10,000 to fix the errors."

After Lee withdrew as Echols's bankruptcy attorney in July 2020, Echols hired Hallaq Law to represent him before the bankruptcy court.[3] Hallaq's office emailed the bankruptcy trustee to alert him to the "severe misunderstanding" that Lee did not include the Property when Echols petitioned for bankruptcy in 2019. In July 2020, the trustee moved to reopen Echols's bankruptcy. Hallaq added the Property and Eastside's mortgages. In October 2020, in a declaration to the bankruptcy court, Lee explained he had searched for evidence of land ownership at the King County Recorder's office based on Echols's name and found no relevant records. Based on his exploration of the events and the lack of documentation, Lee believed that Echols had been "duped" and had no interest in the Property as an owner or contracting party, but "[i]n retrospect," Lee declared he should have "insisted on getting [the] details."

Nearly a year later, in June 2021, the trustee filed a second no distribution report. The bankruptcy court entered an order abandoning the estate's interest in Echols's Property, and, through Hallaq's efforts, it removed three of the nine liens placed on the Property for judgments entered before Echols took ownership in

---

[3] Both Brian Hallaq and his partner Diem Hallaq appear in the record for Echols. As Brian ultimately provided a declaration in support of Echols's malpractice action, references to Hallaq refer to Brian unless otherwise specified.

4

March 2019.[4] The court closed Echols's bankruptcy a second time in October 2021.

In February 2022, the trustee on the deed of trust for the Property issued an amended notice of a trustee's sale of the Property in April. At that time, regular interest due on its first mortgage totaled $89,069.57 and default interest totaled $90,119.89. Echols tried to sell the Property in March 2022, but his buyer needed more time to arrange financing. Eastside sold the Property at a trustee's sale on April 1, 2022, for $460,001.

Echols had already filed suit, pro se, against Lee in January 2022. Echols alleged Lee prepared his bankruptcy "erroneously" and claimed as damages his fees paid to reopen his bankruptcy, his fees paid for a subsequent Chapter 13 bankruptcy, his loss of equity, and "[g]eneral damages for pain and suffering and punitive damages."

Lee moved for summary judgment in October 2022 challenging Echols's evidence of breach, causation, or damages. Echols obtained legal representation and filed a response. His brief clarified that he sought damages for fees paid to his new bankruptcy attorney, for his loss of equity in the Property, for the increased interest charges he paid, and for emotional distress. In reply, Lee withdrew his breach and damages arguments, thus limiting his motion to Echols's emotional distress claim. The court granted Lee's motion.

---

[4] The record shows Hallaq obtained default judgments in Echols's favor for the liens on four judgments total, those owed to Bascomb, Robinson, Alaska Cascade, and "Meter at [address], LLC."

In February 2023, Lee moved for partial summary judgment on "the bulk" of Echols's damages claims for lack of evidence, including loss of equity, loss or rental income, increased interest charges, home improvement costs and other unspecified damages. In March, the court granted Lee's motion. It held that

> [Echols] lacks admissible evidence as to the inability to secure refinancing because of liens on the [P]roperty at issue that should have been discharged in the initial bankruptcy proceedings, or that [Echols] would have been able to secure a loan, but for the liens on the [P]roperty attributable to Defendant Lee's failure to include the [P]roperty in the initial bankruptcy schedule.

In a footnote, the court noted, "No evidence was presented from a financial institution representative, mortgage representative[,] or other loan industry individual as to why Mr. Echols was unable to secure necessary refinancing." The same footnote states, "Refinancing was necessary to preserve [Echols]'s equity in the [P]roperty at issue."

The parties stipulated to the dismissal of the remaining claims, resulting in a final judgment. Echols appealed.

DISCUSSION

We review summary judgment orders de novo, engaging in the same analysis as the trial court. Borton & Sons, Inc. v. Burbank Props., LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020). A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We view all facts and reasonable inferences in the light

6

most favorable to the nonmoving party. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). A material fact is one upon which the outcome of the litigation depends, either in whole or in part. VersusLaw, Inc. v. Stoel Rives, LLP, 127 Wn. App. 309, 319, 111 P.3d 866 (2005).

After the moving party meets its initial burden to show no issues of material fact, "the inquiry shifts to the party with the burden of proof at trial." Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). When responding to the summary judgment motion, the nonmoving party cannot rely on mere allegations in the pleadings. Young, 112 Wn.2d at 225. Instead, the party, "by affidavits or as otherwise provided" in CR 56, "must set forth specific facts showing that there is a genuine issue for trial." Id. at 225-26. " 'A nonmoving party in a summary judgment may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value.' " Martin v. Gonzaga Univ., 191 Wn.2d 712, 722, 425 P.3d 837 (2018) (quoting Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). The nonmoving party must offer more than conclusory statements. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 140, 331 P.3d 40 (2014). The nonmoving party is nevertheless entitled under CR 56 "to have its evidence treated as true and to be given the benefit of all inferences therefrom." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 227, 522 P.3d 80 (2022).

7

To establish a claim for legal malpractice, a plaintiff must prove the following elements: (1) the existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between the attorney's breach of the duty and the damage incurred. Hizey v. Carpenter, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992).

The issues in dispute are the availability of damages for emotional distress and whether there was sufficient evidence of causation of other damages to withstand summary judgment dismissal.

I.       Availability of emotional distress damages

Echols claims that the court erred by dismissing his claim for emotional distress when he faced a threat of criminal prosecution. Lee argues that Echols is not entitled to emotional distress damages under the test in Schmidt v. Coogan, 181 Wn.2d 661, 674, 335 P.3d 424 (2014). We agree with Lee.

Damages for emotional distress are available for attorney negligence "when emotional distress is foreseeable due to the particularly egregious (or intentional) conduct of an attorney or the sensitive or personal nature of the representation." Id. Whether a plaintiff may recover emotional distress damages for legal malpractice is a question of law that we review de novo. Id. at 665.

Thus, there are two ways to establish foreseeability: (1) the attorney's egregious conduct or (2) the sensitive or personal nature of the representation.[5]

Here, Echols concedes Lee's representation of him was not of a sensitive or personal nature. Instead, Echols argues that Lee's conduct was "egregious (or intentional)" because Lee "knowingly set [Echols] adrift" when Lee asked Echols for $10,000 to remove the liens from the Property. That is, Echols does *not* argue Lee intentionally failed to include the Property in Echols's first bankruptcy. Br. of Appellant at 56 ("Mr. Lee's initial omission . . . may not be egregious on its own"). He argues that Lee's actions *after* the initial omission were done "knowingly," i.e., asking for additional payment.[6]

In support, Echols highlights the Schmidt court's reasoning, from Restatement (Third) of the Law Governing Lawyers § 53 cmt. g (AM. LAW INST. 2000), that emotional-distress damages are ordinarily not recoverable when a lawyer's misconduct causes the client to lose profits from a commercial transaction, but are ordinarily recoverable when misconduct causes a client's imprisonment.[7] Schmidt, 181 Wn.2d at 673. But Echols does not argue that he lost his liberty. Instead, he argues that the bankruptcy trustee hired an attorney

---

[5] Echols argues that even the possibility of criminal charges caused him to become physically ill. But evidence of objective symptomatology does not define the subject matter of the representation; indeed, such proof is not even required to establish emotional distress damages. Schmidt, 181 Wn.2d at 675 (proof of emotional distress does not require physical impact or objective symptomatology).

[6] Echols reiterated this basis for his emotional distress claim at oral argument. See Wash. Ct. of Appeals oral argument, Echols v. Lee, No. 85408-9-I (Nov. 15, 2023), at 18 min. 35 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111169/?eventID=2023111169.

[7] It is a federal crime, punishable by fine or no more than five years of imprisonment, or both, for a debtor to knowingly and fraudulently conceal property from a U.S. Trustee. 18 U.S.C. § 152.

who told Hallaq that he intended to refer Echols to the U.S. Trustee's office for prosecution. No record evidence suggests such a referral was ever made, and Echols never defended himself against allegations that he violated the bankruptcy code. To the contrary, Hallaq's declaration states that attorney Lee's declaration "effectively vindicated Mr. Echols with respect to allegations of criminal violations." By asking for additional payment to reopen the bankruptcy, Lee did not engage in the type of egregious or intentional conduct contemplated by the court in Schmidt. Because Lee's omission was not egregious or intentional such that emotional distress would be foreseeable, we conclude that the court did not err when it granted Lee summary judgment as a matter of law regarding Echols's claim of emotional distress.

II.     Proximate cause and damages

Echols also contends the trial court erred by dismissing his claims for other damages because he provided evidence sufficient to raise questions of fact regarding both causation and damages. We disagree.

The general principles of causation are no different in a legal malpractice action than in an ordinary negligence case. VersusLaw, 127 Wn. App. at 328. Specifically, to prove causation in a legal malpractice case, a client must show that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence. Kommavongsa v. Haskell, 149 Wn.2d 288, 300, 67 P.3d 1068 (2003). "Proximate cause consists of two elements: cause in fact and legal causation." VersusLaw, 127 Wn. App. at 328. " 'Cause in fact refers to the "but for" consequences of an act, that is, the immediate connection between an

act and an injury.' " Id. (quoting City of Seattle v. Blume, 134 Wn.2d 243, 251-52, 947 P.2d 223 (1997)). The plaintiff must establish that the act or omission complained of "probably caused" the subsequent injury. Id. The first step is to determine whether a client's case was lost or compromised by the attorney's alleged misconduct. Shepard Ambulance, Inc. v. Helsell, Fetterman, Martin, Todd & Hokanson, 95 Wn. App. 231, 235, 974 P.2d 1275 (1999). The second step is to determine whether the client would have fared better but for the attorney's misconduct. Id. at 236. Both steps are for the trier of fact. Id. (citing Daugert v. Pappas, 104 Wn.2d 254, 257, 704 P.2d 600 (1985)). "Legal causation rests on considerations of policy determining how far a party's responsibility should extend." VersusLaw, 127 Wn. App. at 328 (citing Blume, 134 Wn.2d at 252). Only when the facts are undisputed and the inferences plain does proximate cause become a question of law for the court. Daugert, 104 Wn.2d at 257.

As to proof of damages, generally, a plaintiff must establish damages with reasonable certainty. Lewis River Golf, Inc. v. O.M. Scott & Sons, 120 Wn.2d 712, 717, 845 P.2d 987(1993). Certainty is more concerned with the fact of damage than with the amount of damages. Gaasland Co. v. Hyak Lumber & Millwork, Inc., 42 Wn.2d 705, 712, 257 P.2d 784 (1953). Evidence of the amount of damages "is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." Clayton v. Wilson, 168 Wn.2d 57, 72, 227 P.3d 278 (2010) (quoting State v. Mark, 36 Wn. App. 428, 434, 675 P.2d 1250 (1984)). The measure of damages for legal malpractice is the amount of loss actually sustained as a proximate result of the

11

attorney's conduct. Schmidt, 181 Wn.2d at 670. Trial court decisions addressing the proper components of damage awards are reviewed de novo. Shoemake v. Ferrer, 143 Wn. App. 819, 825, 182 P.3d 992 (2008), aff'd, 168 Wn.2d 193, 225 P.3d 990 (2010).

### A.    Loss of equity and increased interest charges

It is undisputed that Echols would have had to refinance the Property in order to avoid increased interest charges on the Eastside loans and, ultimately, foreclosure. Echols argues that Lee's failures were twofold. First, Lee's failure to include the Property left judgment liens in place that rendered his effort to refinance a "fruitless endeavor." Second, he argues that Lee's failure to list the Property led to his second attorney, Hallaq, having to file to reopen his bankruptcy and his consequent loss of control of the property to the bankruptcy trustee for almost a year.[8] Echols argues that both of these failures made refinancing "an impossibility" and, thus, he had to pay higher interest charges on the Eastside loan. Lee argues Echols "cannot show that he would have secured additional funding to pay off his loans," so Echols "failed to meet this necessary element." We agree with Lee.

The summary judgment evidence included an expert declaration by bankruptcy attorney Marc Stern, who opined that but for Lee's negligence, the Property would have been listed on the bankruptcy schedule. Stern explained

---

[8] At oral argument Echols referred to this theory, that the reopening his bankruptcy and the trustee's possession of the Property for another year caused his damages, as "part 2" of Lee's negligence. Wash. Ct. of Appeals oral argument, supra, at 5 min., 09 sec to 7 min., 21 sec.

that Echols's "expectancy in real property" and debt obligation on the Property should have been listed on the Statement of Affairs and, "presuming they were ongoing payments," also on Schedule D. Stern further opined that the "only issue was valuation of the asset," but that he was "unwilling to opine about the nature of the asset," whether it was real property or "some sort of personalty." Stern did not provide any opinion regarding any specific consequence from the failure to include the Property in the bankruptcy filings.

Echols's loss of equity claim was based on the value of the Property at the time of foreclosure. Echols had purchased the Property for $300,000, entirely financed through two promissory notes he gave to Eastside, one for $280,154.36 and one for $21,558.18. Eastside's two loans came due the week before Echols's bankruptcy was discharged the first time in June 2019. In April 2022, the foreclosed Property was sold at a non-judicial sale for $460,001. At that time, Echols owed Eastside $489,125.01, including interest, on his $280,154.36 first mortgage alone.

Under Echols's first theory of causation, had the Property been listed in the original bankruptcy petition, the liens would have been discharged, and he would have been able to obtain refinancing. Echols estimates his loss of equity as $324,998.33, measured as the asserted fair market value of the property when it was foreclosed ($650,000) "less the amount he would have paid under the normal refinance with Alera" in 2020 ($325,001.67). And Echols argues that had he obtained refinancing, he would not have owed additional interest on the Eastside loans.

To establish that Lee's negligence was the proximate, or "but for," cause of his loss in equity and increased interest charges, Echols must ultimately prove that if it were not for the liens, he would have refinanced and "fared better." Shepard Ambulance, 95 Wn. App. at 236. Under his second theory, he must prove that were it not for the Property being tied up in the reopened bankruptcy proceedings for a year, he would have refinanced and "fared better." To defeat summary judgment, Echols, as the nonmoving party, "by affidavits or as otherwise provided" in CR 56, "must set forth specific facts showing that there is a genuine issue for trial." Young, 112 Wn.2d at 225-26.

At the time Echols's original bankruptcy petition was filed in January 2019, the Property was encumbered by at least nine liens.[9] After the Bankruptcy Trustee abandoned the Property the second time, Echols's second bankruptcy attorney, Hallaq, was able to have four liens removed based on judgments entered prior to Echols's receiving the deed to the Property in March 2019, three of which were present when Echols filed for bankruptcy in January 2019.[10]

Echols's deposition testimony was that "Alera said 'No' when we could not get a clear title," and " '[y]ou got to get a clear title before we can do anything.' " This is at most evidence that the existence of the liens on the Property was an impediment to Echols's ability to secure refinancing. But this evidence is not

---

[9] The November 2019 title report shows a total of 11 liens, two of which were for judgments entered after Echols filed for bankruptcy.

[10] The record does not indicate whether six liens placed by the Washington State Department of Labor and Industries liens based on judgments prior to March 2019 were removed. The record is also silent regarding a subsequent lien placed by Foster and Tracy Jones in July 2019.

enough to establish that Echols would have fared better and obtained refinancing. First, the evidence does not establish that all of the liens would have been removed; the record only shows that Hallaq subsequently removed three of the nine liens that existed at the time of the initial bankruptcy petition. Thus, even had the same three liens been removed, the record does not establish that all of the liens would have been removed such that Echols would have had a clear title.

Further, Alera's offer to refinance was conditional. It required Echols to present a "complete plan set for renovation of home (adding square footage)," a copy of "approved building permits," a general contractor's (GC) license, and an "[u]pdated project cost breakdown from the GC . . . on what has already been paid/completed from the budget." It also required Echols "to explain recent Chapter 7 [bankruptcy]."[11]

There is no evidence in the record that Echols would have satisfied these conditions. To the contrary, Echols testified at his deposition that he had not satisfied some of the conditions. Echols stated that he "had a complete set of

---

[11] Lee argues that the evidence of Alera's conditional loan commitment is hearsay. But he makes no argument to support that conclusion, and the lack of reasoned argument is insufficient to merit judicial consideration. Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). Further, while the trial court concluded that plaintiff "lack[ed] admissible evidence as to the inability to secure refinancing because of liens . . . or that [he] would have been able to secure a loan, but for the liens," it did not make a clear ruling on Lee's specific objections that the Conditional Loan Commitment was inadmissible hearsay. The order on summary judgment shows that the court considered the declarations that attached this evidence. It is the appellate court's "duty to review evidentiary rulings made by the trial court; we do not ourselves make evidentiary rulings." Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC, 139 Wn. App. 743, 756, 162 P.3d 1153 (2007). In Jacob's Meadow, the trial court considered the evidence at issue, and this court held that "[b]ecause the trial court made no ruling on the admissibility of this evidence to which any error has been assigned, the evidence constitutes part of the record before the trial court in ruling on the motion and is, consequently, properly before this court as well." Id.

15

drawings, but it had not been through the City and completed yet, no." He testified there was no approved building permit,

> [b]ecause I never owned the property outright. I never got a clear title, and there's no way in the world I was going to spend more money after a piece of property that I could not even get - - I could not even get the loans - - the liens off to do anything.

Echols testified that he planned "to be the general contractor myself," but that, while he had a general contractor's license in the past, he did not currently have one. There is no evidence from Alera suggesting it would have made a loan to Echols despite these conditions not being met, or on different terms.[12] See Martin, 191 Wn.2d at 722 (" 'A nonmoving party in a summary judgment may not rely on speculation.' ") (quoting Seven Gables Corp., 106 Wn.2d at 13).

Thus, there is insufficient evidence to create a genuine issue of material fact that but for Lee's failure to list the Property in the initial bankruptcy petition or the subsequent reopening of the bankruptcy proceedings, Echols would have fared better by refinancing his Eastside loans. The trial court properly dismissed Echols's claims as to damages from loss of equity and increased interest charges.[13]

---

[12] Nor is there evidence that any other lender was prepared to refinance Echols's interest in the Property. Echols's deposition testimony was that he was "not sure" whether any other lender turned him down and, while he repeats his attorney Hallaq's assertion that his "efforts at refinancing . . . would have been successful," his attorney, as the trial court noted, is not a financial institutions, mortgage, or loan industry expert qualified to opine as to whether Echols would have been able to secure refinancing.

[13] Because there is insufficient evidence of causation, we need not consider whether Echols's loss of equity and increased interest charge damages claims are reasonably certain.

B.        Loss of rental income and development value

Echols claims that he lost rental income when the Property was returned to the bankruptcy estate from July 2020 to June 2021. He also argues that his "original intent" was to build two or three residences at the Property. Lee argues that Echols never tried to rent the house out and was living it and that Echols's plans for developing the Property were dependent on his ability secure refinancing. We agree with Lee.

There is no evidence that Lee's failure to list the Property in the original bankruptcy petition was the "but for" cause of Echols losing rental income. Echols testified that he was living at the house on the Property "from the early part of 2019 until foreclosure." Thus, he had possession of the Property. He admitted he did not put out any advertisement: "no, I didn't do none of that." Echols's suggestion that he could rent out the downstairs, which had no kitchen, as "a studio-type thing" is not evidence that he would have done so, or that he was thwarted from doing so because the Property was in the bankruptcy estate.[14]

Likewise, there is insufficient evidence to withstand summary judgment dismissal of claimed lost development value. As discussed above, Echols cannot establish that either Lee's failure to list the Property in the bankruptcy petition in January 2019 or the subsequent reopening of the bankruptcy proceedings was the proximate cause of his loss of the Property. Moreover, he presented only real

---

[14] As for the amount of lost rental income, Echols's own deposition testimony constituted speculation because he said he lost $67,500 but "I don't recall how we came up with that number." Real estate broker Dan Bundy provided an estimate of lost rental income of $2,000 per month in 2020, $3,000 per month in 2021, and $3,400 per month in 2022 based on the per-month cost to rent a two-bedroom property in Seattle.

estate broker Dan Bundy's opinion that, because the Property contained 13,630 square feet and was zoned R6, Echols "could have" built, "minimum," two or maybe three additional houses on the Property that would have sold for between $618,000 and $649,000 each. The summary judgment record contains no evidence that Echols would have done so—particularly when the record contains no evidence that Echols had the funds to embark on this construction project.

The record does not establish a genuine issue of material fact regarding whether Lee's breach was the proximate cause of Echols's claims for lost rental income or lost development value. There is also insufficient evidence of the lost development damages beyond mere speculation or conjecture. The trial court thus properly dismissed these damages claims.

Affirmed.

_Chung, J._

WE CONCUR:

_Birk, J._          _Dwyer, J._